UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| _____ ) | |
| JOSEPH RICCI and CUSTOM ) | |
| CONSTRUCTION SERVICES, LLC, ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | No. 1:20-cv-00543-MSM-PAS |
| ) | |
| STATE OF RHODE ISLAND and ) | |
| TOWN OF SMITHFIELD, et al. ) | |
| Defendants. ) | |
| _____ ) | |

MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

## I.    INTRODUCTION

> "[S]ome truths are self-evident.  This is one such:  if any concept is fundamental to our American system of justice, it is that those charged with upholding the law are prohibited from deliberately fabricating evidence and framing individuals for crimes they did not commit.  … Actions taken in contravention of this prohibition necessarily violate due process (indeed, we are unsure what due process entails if not protection against deliberate framing under color of official sanction)."
>
> *Limone v. Condon,* 372 F.3d 39, 44-45 (1st Cir. 2004) (internal citation omitted).

The plaintiffs have, in their Third Amended Complaint ("Complaint"),[1] alleged

– and supported with evidence in their summary judgment submission – that

members of the Smithfield Police Department fabricated the existence of a

confidential informant in order to obtain a search warrant.  As further described

---

[1] The Third Amended Complaint is the operative one here and is referred to simply as "the Complaint."  The Court has denied the plaintiffs' request to amend their Complaint for a fourth time.  (ECF No. 79.)

below, the statement contained in the Affidavit in support of the warrant that "the affiant" (defendant Joseph M. Marcello, hereafter "Marcello") had received information from a confidential informant that Joseph Ricci ("Ricci" or "plaintiff") was cultivating large amounts of marijuana was clearly false; the affiant under oath at a deposition denied having any personal contact with an informant. (ECF No. 62-1, at 100.) Moreover, while Marcello said he knew that his supervisor, defendant Michael Smith ("Smith"), had been the one to actually talk to the informant because Smith told him that he met with the informant (ECF No. 62-1, at 100-01), that was not accurate either, as Smith also denied under oath having personal contact with the informant. (ECF No. 62-1, at 138.) What adds to the strength of the inference of fabrication, however, is the failure of the Smithfield Police to find any written documentation, in the form of any notations or file entries or other memorialization, that *anyone* in the Department had contact with the putative informant. (ECF No. 62-1, at 140.) Nor did Smith remember ever seeing a notation about an informant. *Id.*

Fabrication of evidence cuts to the very heart of the integrity of criminal prosecutions. It is one thing for parties to, in good faith, argue vehemently about the law related to the issuance of search warrants and to figuratively "go to war" over the existence of probable cause. It is quite another for a police officer to lie in pursuit of the authority to search.

The allegation is serious. But however strong the inference is that the police simply made up the existence of an informant (and neither Smithfield nor any of its

officers have, in opposition to summary judgment, produced any material negating the inference), it is still an inference only and not direct proof. Such a conclusion, if true, should be drawn by a jury, not by a Court on Motion for Summary Judgment. For that reason, as explained below, the Court denies summary judgment on many counts of this complaint, although it grants it to certain defendants on others.

## II.    BACKGROUND

This case arises out of a dispute between Smithfield resident Ricci and the Police Department of the Town of Smithfield over Ricci's growing marijuana through the licenses he holds as a medical marijuana user and as a caretaker-grower for others. The State of Rhode Island is only tangentially involved, injected into the dispute by a request from the Town to institute forfeiture proceedings against property of the plaintiffs that Smithfield seized. Three Smithfield police officers – Marcello, Smith, and Police Chief Richard St. Sauveur ("St. Sauveur") – are accused in the Complaint of having conducted an illegal search of Ricci's grow operation and business. After the search, the officers seized the building and equipment on behalf of the Town of Smithfield. Ricci alleges that during the ensuing several months, the Town caused the utilities to be turned off, resulting in burst pipes and so much mold that Ricci and his tenants could no longer work there. He and his co-plaintiff company, Custom Construction Services, LLC,[2] seek damages for the value of the

---

[2]  Custom Construction is a plaintiff only with respect to Count II claiming conversion. In the rest of the Counts, the Complaint alleges Ricci as the only plaintiff. (ECF No. 51.)

equipment, the tenancies Ricci had and those he would have had, and their lost income.

The Complaint is a combination of state law and a kitchen-sink of state and federal constitutional claims.  At its heart is the contention under the Fourth Amendment of the United States Constitution that the search and resulting seizure of the building and equipment was unconstitutional because no probable cause existed.  In the face of warrants that render searches conducted under their authority presumptively reasonable and therefore lawful, the plaintiffs allege that the Smithfield police officers deliberately swore to and submitted false and fabricated information in the affidavits supporting the warrant applications.  From that alleged fabrication spring five claims:  (1) a Fourth Amendment claim brought through 42 U.S.C. § 1983;  (2) a direct right-of-recovery claim alleging a violation of Rhode Island's constitutional search provision, R.I. Const. Art. 1 § 6; (3) a companion claim that a violation of Article 1 § 6 also constitutes a violation of Rhode Island's constitutional due process guarantee, R.I. Const. Art. 1 § 2; (4) a direct right-of-recovery claim of a denial of due process under Article 1 § 2, and (5) a claim of a denial of due process under the Fourteenth Amendment.  The Plaintiffs also claim a violation of the excessive fines prohibition of the Eighth Amendment and a direct right-of-recovery under R.I. Const. Art. 1 § 8 on a similar theory.  There is an additional claim under the Rhode Island Civil Rights Act ("RICRA") that Ricci's medical marijuana card renders him a "disabled" person and that he has been discriminated against because of that disability.  The remaining claims rely on state

law causes of action of trespass, conversion, intentional infliction of emotional distress, false imprisonment, and replevin.

Before the Court are the parties' Cross-Motions for Summary Judgment (ECF Nos. 56, 59, 62.) After parsing these claims and reviewing the material submitted by the parties and the relevant law, the Court DENIES the plaintiffs' Motion for Summary Judgment (ECF No. 62), GRANTS the Motions for Summary Judgment of the State of Rhode Island (ECF No. 59) and of the Town of Smithfield (ECF No. 56), and GRANTS in part and DENIES in part the Motion for Summary Judgment of the Smithfield individual police officers (ECF No. 56.)

## III.  STANDARD OF REVIEW

The parties have filed Cross-Motions for Summary Judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure.  Summary judgment's role in civil litigation is "to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." *Garside v. Osco Drug Inc.,* 895 F.2d 46, 50 (1st Cir. 1990) (quoting Fed. R. Civ. P. 56(e) Advisory Committee Notes).  Summary judgment can be granted only when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56.  "A dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. A fact is material if it carries with it the potential to affect the outcome of the suit under

the applicable law." *Santiago–Ramos v. Centennial P.R. Wireless Corp.,* 217 F.3d 46, 52 (1st Cir. 2000) (quoting *Sanchez v. Alvarado,* 101 F.3d 223, 227 (1st Cir. 1996)).

In ruling on a Motion for Summary Judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." *Feliciano de la Cruz v. El Conquistador Resort & Country Club,* 218 F.3d 1, 5 (1st Cir. 2000) (citing *Mulero–Rodriguez v. Ponte, Inc.,* 98 F.3d 670, 672 (1st Cir. 1996)). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I,* 53 F.3d 454, 460 (1st Cir. 1995). Furthermore, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial. … If the evidence presented 'is subject to conflicting interpretations, or reasonable [people] might differ as to its significance, summary judgment is improper.'" *Gannon v. Narragansett Elec. Co.,* 777 F. Supp. 167, 169 (D.R.I. 1991) (citing and partially quoting 10A Charles A. Wright, Arthur R. Miller & Mary K. Kane, *Federal Practice & Procedure Civil,* § 2725, at 104 (1983)).

## IV.    FACTUAL BACKGROUND

### A.    THE SEARCHES

On or about October 17, 2017, Marcello, then a detective on the Smithfield police force, signed an affidavit, under pain of perjury, swearing that a person identified as "Source One" "informed [him] that they have knowledge that Joseph M. Ricci [of Smithfield, Rhode Island] is growing and selling marijuana from his vacant

6

commercial building located at [Smithfield, Rhode Island]." (ECF No. 62-1, at 53.) The affidavit alleged that Source One had spoken personally to Marcello. Ricci was indeed growing marijuana, as it is not disputed that he held a license both as a medical marijuana patient and a caretaker for others which permitted him to grow up to 12 plants for himself and each of those qualified patients for whom he was a caretaker. (ECF No. 62-1, at 53)[3]; R.I.G.L. 21-28.6-4(a) and (f). He was also entitled to possess a certain amount of "usable" marijuana and a certain amount of wet marijuana. *Id.* The Smithfield Police soon became aware of these licenses but called the Rhode Island Department of Business Regulation ("DBR") to determine whether the plaintiff held a "cultivation license." *See* R.I.G.L. § 21-28.6-16. They were told that he did not. DBR, however, never indicated that the plaintiff was required to hold a special cultivation license and none of the defendants have alleged that he was so required.

The tip plus Marcello's allegation that Ricci's van was seen taking an unspecified "evasive motion" [sic] when leaving the business formed the basis of the affidavit supporting a search warrant issued on October 16, 2017, by state District Court Judge Stephen Isherwood. (ECF No. 62-1, at 52.) The Affidavit also recited that the owner of a silver Ford parked on Ricci's property was a medical marijuana patient. *Id.* at 54. Finally, the affidavit contained information about a large amount

---

[3] Many facts are undisputed here. The central fact in dispute is whether a confidential informant exists who passed along information to the Smithfield Police Department, as asserted in the affidavit.

of electricity being used in the building. *Id.* at 55. The warrant authorized Smithfield to conduct "thermal imaging" from the outside of the building, a search under the Fourth Amendment. *Kyllo v. United States,* 533 US. 27, 40 (2001). The thermal scan revealed the cultivation of marijuana inside.[4] The scan could not determine the quantity of marijuana inside the building. (ECF No. 62-1, at 102.)

Smithfield then applied for a second warrant, this time authorizing a search of the building's interior. (ECF No. 62-1, at 106.) Again, the affidavit included Marcello swearing to a personal conversation with Source One. (ECF No. 62-1, at 107.) Again, on October 22, 2017, a warrant was issued. *Id.* at 106. Armed with that warrant, Smithfield police searched the entire property. Concluding that the plaintiff was growing more marijuana than his licenses permitted, Smithfield seized the building itself, the marijuana, his work van, tools, and other equipment owned by Custom Construction, and by law became responsible for its care and the upkeep of the premises. R.I.G.L. § 21-28-5.04.2(d)

On some unspecified date after the seizures, the Smithfield Police Department had the utilities to the building shut off. According to the Complaint, this resulted in a number of separate injuries: the building became uninhabitable due to the loss of utilities and mold that began to grow; the plaintiffs could no longer use the premises;

---

[4] The scan was conducted by an employee of the State, who was loaned to Smithfield for that purpose. The Complaint does not allege that any cause of action or any theory of liability against the State relies on the employment status of this individual.

and Ricci's tenants could no longer use the premises.[5]  Following the seizure of the property, the Town requested that the State initiate forfeiture proceedings, which it did in accordance with the mandatory requirement of R.I.G.L. § 21-28-5.04.2(f) and (g).  The forfeiture complaint was filed on November 22, 2017, and proceedings are ongoing.  *State of Rhode Island v. One 2014 Mercedes-Benz Sprinter et al,* PC-2017-5620.[6]

## B.  DISCOVERY

During discovery, the plaintiffs deposed defendant Marcello, the officer who had sworn in the first and second warrant affidavits that he had spoken to Source One personally and had received the tip.  In a deposition, Marcello admitted that he had never talked to Source One personally and had learned the information at least second-hand.  He acknowledged that he did not know for certain who had spoken to Source One, but he believed it was his superior, defendant Smith.  Smith was then deposed.  He, too, admitted that he had never spoken to Source One personally.  He went further and acknowledged that there were no records, or documentation of any sort memorializing that "a Source One" had ever contacted the Smithfield Police with

---

[5] The plaintiffs have produced some evidence of the damages caused.  (ECF No. 62-1, Exh. 17-20.)

[6] According to the docket of this proceeding, Ricci's motion to suppress will be heard on August 16, 2023.   In his First Amended Notice of Interested Party, he raised three challenges to the forfeiture:  a) that Smithfield has targeted medical marijuana patients, including him, in violation of the Slater-Hawkins Act, R.I.G.L. § 21-28.6-4; that there was no probable cause for the searches and seizures, and that they therefore violated R.I. Const. Art. 1 § 6 and U.S. Const. Amend IV; and that the total value of the seized property constitutes an excessive fine in violation of R.I. Const. Art. 1 § 8 and U.S. Const. Amend. VIII.  The Court may take judicial notice of the docket.  *United States v. Mercado,* 412 F.3d 243, 247 (1st Cir. 2005).

the supposed tip of Ricci's cultivation activity.  (ECF No. 62-1, at 100-01, 138, 140.) Smithfield repeated these admissions in its responses to Requests for Admissions. (ECF No. 62-1, at 146.)

Based on that discovery, the plaintiffs amended their earlier complaint to allege false statements in the affidavits filed to support the requests for search warrant.  They contend there is no Source One and that there never was a Source One, except as a total knowing and willful fabrication of the Smithfield Police.

## V.    DISCUSSION

### A.    CLAIMS AGAINST THE STATE

The State seeks summary judgment for a number of reasons, most of which argue some type of immunity.[7]  The Court agrees that the claims against the State are barred by the principle that the State is generally immune for suits for monetary damages.  In addition, there is a conspicuous and fatal absence of proof that the State took any affirmative action which created liability under any of the plaintiffs' theories.

#### 1.  Count I

Count I, claiming trespass, recites only that the Smithfield police officers "should be considered joint tortfeasors with the . . . State of Rhode Island because [their] fabrication of evidence caused the issuance of unconstitutional search warrants."  (ECF No. 51, ¶ 56, 59.)  Every one of the other allegations relates only to

---

[7] There is no question that the portion of the action seeking monetary damages from the State cannot be maintained.  *Will v. Michigan,* 491 U.S. 58, 71 (1989).

Smithfield (ECF No. 51, ¶¶ 50 – 55, 57 – 58, 60 - 61), and the State clearly did not take part in any fabrication of the warrants.  It was Smithfield officers who applied for the warrants, a Smithfield officer who swore to the truth of the Affidavits in support of the warrants, Smithfield officers that entered the property, Smithfield officers that searched, Smithfield officers who seized the property and, pursuant to Rhode Island law, became responsible for it, Smithfield and its employees that caused the utilities to be shut off, and Smithfield and its employees who are alleged to have caused the damage by failing to maintain the property. Labeling the State a "joint tortfeasor" does not substitute for factual allegations required to support a cause of action.

### 2. Count II

Count II – alleging conversion – suffers from the same infirmity as Count I. The State is mentioned only in a paragraph alleging tortfeasor status because of Smithfield's fabrications, and a paragraph faulting the Town for initiating a forfeiture action.  (ECF No. 51, at ¶¶ 68, 71.)  There are no facts alleged or evidence provided that even connect the state to the fabrications or application for warrants. To the extent that the state's putative liability rests on its initiation of forfeiture proceedings which caused the plaintiff to lose control over the property, the State is obligated by statute to initiate a forfeiture action if requested by a municipality, so long as the property appears subject to forfeiture, R.I.G.L. § 21-28-5.04.2(g), and the plaintiffs cite nothing attaching any liability to that decision.  Moreover, the initiation of forfeiture proceedings by the State is an exercise of prosecutorial duty pursuant to

11

R.I.G.L. § 21-28-5.04.2(g) ("[I]f it is probable that the property is subject to forfeiture [the attorney general] shall immediately cause the initiation of administrative or judicial proceedings against the property"). That is a prosecutorial function for which the State has absolute immunity. *Imbler v. Pachtman,* 424 U.S. 409, 422-23 (1976). "[A]cts undertaken by a prosecutor in preparing for the initiation of judicial proceedings or for trial, and which occur in the course of his role as an advocate for the State, are entitled to the protections of absolute immunity." *Buckley v. Fitzsimmons,* 509 U.S. 259, 273 (1993). *Accord; Beaudoin v. Levesque*, 697 A.2d 1065, 1068 (R.I. 1997) (absolute immunity for assistant town solicitor in role as prosecutor); *Diorio v. Hines Rd., LLC,* 226 A.3d 138, 145 (R.I. 2020) (quoting *Goldstein v. Galvin,* 719 F.3d 16, 24 (1st Cir. 2013) ("a state official who performs prosecutorial functions … is absolutely immune from damages actions."). Forfeiture is not "primarily investigative or administrative in nature," *Perez v. Ellington,* 421 F.3d 1128, 1133 (10th Cir. 2005) (cited in *Penate v. Kaczmarek,* 928 F.3d 128, 140 (1st Cir. 2019). It is an enforcement action and, as such, warrants the same absolute immunity that protects prosecution functions generally. *Cooper v. Parrish,* 203 F.3d 937, 948 (6th Cir. 2000) (absolute prosecutorial immunity for bringing civil forfeiture complaints); *cf. Skinner v. Govorchin,* 463 F.3d 518, 525 (6th Cir. 2006) (applying absolute immunity to prosecution to recover civil costs, an "enforcement role in initiating judicial proceedings"). *See also Torres v. Goddard,* 793 F.3d 1046, 1058 (9th Cir. 2015).

### 3. Counts III, IV, X and XII.

These Counts are not brought against the State.

### 4. Counts V, VII, and IX

Each of these counts claims a violation of a provision of the Rhode Island Constitution: Art. 1, §§ 6, 2 and 8 respectively. Separate from the lack of factual basis for liability on the part of the State, the Rhode Island Constitution, for reasons expressed below at Part V(C)(4), does not give rise to private causes of action.

### 5. Count VI

This Count alleges a violation of the federal Due Process Clause. The only factual assertions that support the claim are contained at ECF No. 51, ¶¶ 115 through ¶ 117, and no state actor is mentioned.

### 6. Count VIII

This Claim alleges that the State violated the Excessive Fines Clause of the Eighth Amendment. The Constitution does not generally enable a direct cause of action. An exception to that rule lies for actions brought to vindicate Fourth Amendment violations by federal officials. *Bivens v. Six Unknown Named Agents,* 403 U.S. 388 (1971). The First Circuit has cautioned, however, against extending *Bivens* generally to other constitutional provisions. "When there is a request for the judicial creation of a supplemental damages remedy arising directly under a constitutional provision, *Bivens,* we think, teaches that a federal court should proceed with caution." *Kostka v. Hogg,* 560 F.2d 37, 42 (1st Cir. 1977). It is doubtful that a *Bivens-*type action lies against *state* officials. *Thompson v. Hassett,* 513 F. Supp. 3d

258, 259 (D.R.I. 2021).  In addition, the claim against the state is again based on its role in initiating forfeiture proceedings and, for the reasons explained above, its immunity for that action is absolute.

### 7.  Count XI

In Count XI the plaintiffs seek replevin of the property seized by Smithfield. Although the Complaint alleges that the property is in the possession of both Smithfield and the State, Rhode Island law renders Smithfield the custodian, as it was Smithfield that seized it.  R.I.G.L. § 21-28-504(b) ("Property taken or detained under this section shall not be repleviable, but shall be deemed to be in the custody of the law enforcement agency making the seizure.").  If there is no proof submitted showing possession by the State, no action for replevin can be maintained against the State.  Moreover, as the State points out, Rhode Island law does not permit an action for replevin to regain property which has been made the object of forfeiture.  *Id.* Finally, to the extent replevin depends on wrongful forfeiture, the State has immunity.

For the reasons explained above, the State of Rhode Island's Motion for Summary Judgment is GRANTED with respect to all Counts in which it is named – Counts I, II, V, VI, VII, VIII, IX and XI.

### B.    MUNICIPAL LIABILITY

Several of the Counts seek to impose liability against the municipality of Smithfield for civil rights violations.  *See* Counts IV (Fourth Amendment), VI (Fourteenth Amendment) and X (discrimination on the basis of disability).  Smithfield

14

points out a mismatch between the plaintiffs' Complaint and their Memorandum in Support of Summary Judgment. The Memorandum does, as the Town notes, devote a substantial effort to arguing that Smithfield has failed to properly train its officers on the rights of medical marijuana card holders and growers. (Plaintiff's Memorandum, ECF No. 62-1, at 18-19). But as the defendants point out, the Complaint – amended three times – includes no claim for lack of training under *Monell v. New York City Dep't of Soc. Services,* 436 U.S. 658 (1978). *Monell* is broader, however, than training and supervision. Municipal liability can be established "when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury . . . ." *Id.* at 694. The plaintiff must show not only that there was "a policy or custom [that] led to the [] deprivation alleged," but also "the existence of . . . a causal link between that policy and the [] harm." *Santiago v. Fenton,* 891 F.2d 373, 381 (1st Cir. 1989).

The Court agrees that nothing in the factual submissions from the plaintiffs supports the conclusory assertion that Smithfield, either as a municipal entity or through its policymaking personnel in the Police Department, had an official policy or custom of discrimination against medical marijuana patients. Nor do any of the factual submissions support the assertion that Smithfield failed to properly train its officers in enforcing marijuana laws against card holders *or* in carrying out searches. In response, the plaintiffs assert that "the complaint includes multiple references to the Smithfield PD's lack of knowledge and training as to the rights of Rhode Island

medical marijuana patients.  See *Plaintiff's Third Amended Complaint.*" (ECF No. 78, at 3.)  The plaintiffs do not point out, however, where those "multiple references" are.  They point only to the allegation that defendant St. Sauveur, as Chief of Police, himself had "an ongoing antagonism towards medical marijuana patients within the Town." *Id.* at 4.

The same failure precludes liability against the municipality of Smithfield for Fourth and Fourteenth Amendment violations.

Therefore, the Court GRANTS the Motion of the Town of Smithfield for summary judgment in its favor on Counts IV, VI and X.

### C.    CLAIMS AGAINST INDIVIDUAL DEFENDANTS

### 1. Claims Dependent upon the Validity of the Warrant

Several claims involve the validity of the search warrants, which the plaintiffs challenge as having been issued in reliance on deliberately false statements. Generally, "[a] search warrant executed by a judicial officer stands as an imposing impediment to [a] Fourth Amendment] claim." *Jordan v. Town of Waldoboro,* 943 F.3d 532, 540 (1st Cir. 2019), *rev'd on other gnds, Thompson v. Clark,* ___ U.S. ___, 142 S. Ct. 1332 (2022).  A valid search warrant would be an equally strong defense to the plaintiffs' claim of trespass, and a seizure authorized by such a warrant would preclude liability for conversion.  In 1978, however, the Supreme Court held that a warrant is void if it depends for probable cause on knowing or recklessly false statements made in the affidavit supporting it.  *Franks v. Delaware,* 438 U.S. 154, 156 (1978).  A defendant who makes a substantial preliminary showing "that a false

statement knowingly and intentionally, or with reckless disregard for the truth, was included by the affiant in the warrant affidavit, and if the allegedly false statement is necessary to the finding of probable cause," is entitled to a hearing. *Id.* at 155-56. If at the hearing,

> [t]he allegation of perjury or reckless disregard is established . . . and, with the affidavit's false material set to one side, the affidavit's remaining content is insufficient to establish probable cause, the search warrant must be voided, … to the same extent as if probable cause was lacking on the face of the affidavit.

*Id.* at 156. That showing overcomes the presumption of validity of the affidavit supporting the search warrant. *Id.* at 171.

*Franks,* interestingly, involved a very similar set of facts to the plaintiffs' allegations here. The affidavit in *Franks* alleged that two men – James William and Wesley Lucas – "revealed to your affiant" that the defendant normally wore clothing that matched the description of the perpetrator given by an eyewitness. *Id.* at 176. The defendant requested a hearing at which he would produce evidence that neither Williams nor Lucas had actually spoken personally to the affiant. *Id.* at 158. Reversing the lower court's denial of a hearing, the Supreme Court said proof of a deliberate or reckless falsehood about whether the affiant had spoken personally to those witnesses would undermine the validity of the warrant such that it could not be relied upon to validate the search and the search loses its presumption of validity.[8]

---

[8] Deliberately or recklessly false statements in other pre-indictment contexts can vitiate the legitimacy of the process. "Lying is wrong, and if the police lie while acting in their official capacity, they also violate the public trust." *Riccuiti v. N.Y.C. Transit Auth.,* 124 F.3d 123, 125 (2d Cir. 1997) (holding that a fabricated confession included

The affidavit's assertion that its affiant spoke personally to a confidential informant – and, more importantly, whether a confidential informant in fact ever existed or was totally fabricated – are material facts and their existence is hotly disputed.  Without the allegations from the informant, the observations of the Smithfield police that Ricci traveled on side roads and that another medical marijuana cardholder was seen at the premises does not come close to probable cause of illegal activity.  The second warrant rested on the same information as the first, with the addition only of the thermal imaging scan showing large amounts of heat generated in the building.  Since Ricci was a lawful marijuana grower, and the thermal imaging could not determine the quantity of what was being grown, it added little to the information supporting the first warrant.  Both warrants depended on the putative informant's allegations.

Ricci has submitted evidence from the affiant himself that demonstrates he did not speak personally to an informant.  But the evidence of total fabrication relies on an inference from the denials of Marcello and Smith, and the absence of any written documentation of contact by an informant with anyone in the Department.[9]  That inference, while strong, is not compelling, and needs to be drawn by a jury, if at all, not by the Court on summary judgment.

---

in a police narrative, which became the basis for escalation of the charges, was actionable through § 1983 for a Fourth Amendment violation).

[9] The claims against defendant St. Sauveur, Chief of the Department, rest on allegations that he was aware of the fabrication of an informant and assisted in a cover-up.

Because of the existence of a genuine issue of material fact, claims that turn on the validity of the warrant are inappropriate for summary judgment. That includes trespass (Count I), to which a valid warrant is a defense, and conversion (Count II), to which a valid seizure of the property is a defense. And it includes the crux of this case which is the alleged illegal searches and seizures of the plaintiff's property forming the basis of Count IV (unlawful search) and Count XII (false arrest/imprisonment). The Court DENIES the Motions of the individual defendants for Summary Judgment as to Counts I, II, IV and XII.

### 2.  Count VI:  Denial of Federal Due Process, U.S. Const. Amend. 14

Ricci predicates his claim under U.S. Const. Amend. XIV on two separate theories, although he does not distinguish between the two in his Complaint. First, he maintains that by definition a violation by state officials of the Fourth Amendment to the U.S. Constitution is a per se violation of the Fourteenth Amendment. (ECF No. 51, ¶ 114.) That is true. The Fourth Amendment governs the conduct of state officials only through its incorporation into the Fourteenth Amendment, *Mapp v. Ohio,* 367 U.S. 643, 660 (1961), and, therefore, any violation of the Fourth Amendment by a state actor is necessarily a violation of the Fourteenth. But because that is true, the Fourth Amendment violation claimed in Count IV essentially merges with the *per se* claim under the Fourteenth Amendment. The Court treats Count IV

in combination with Count VI as invoking the federal constitutional right against unreasonable searches and seizures.

The alternative theory put forth by Count VI is that of a violation of the plaintiff's substantive due process right – behavior on the part of law enforcement that "shocks the conscience" of the Court. The "shock the conscience" doctrine was first enunciated in *Rochin v. California,* 342 U.S. 165, 172 (1952), at a time before the Fourth Amendment was incorporated into the Fourteenth Amendment. In the criminal prosecution arena, "[r]egard for the requirements of the Due Process Clause 'inescapably imposes upon this Court an exercise of judgment upon the whole course of the proceedings . . . in order to ascertain whether they offend those canons of decency and fairness which express the notions of justice of English-speaking peoples . . .'" *Id.* at 169 (quoting *Malinski v. New York,* 324 U.S. 401, 416-17 (1945)). Finding that forcible stomach-pumping in search of two swallowed capsules of morphine, after an unsuccessful attempt to extract the capsules from the defendant's throat, were "methods too close to the rack and the screw to permit of constitutional differentiation," *id.* at 172, the Court ordered their exclusion from evidence.

*Mapp v. Ohio* put an end to the need to resort to the Fourteenth Amendment to vindicate the right against unreasonable searches by state actors, but *Rochin's* due process theory has continued viability, particularly in the context here. A number of courts have recognized fabricated evidence as a basis for a "shock the conscience" due process claim. A plaintiff may maintain such a claim even if never convicted of an offense. *Black v. Montgomery Cnty.,* 835 F.3d 358, 369 (3rd Cir. 2016); *Klen v. City*

*of Loveland,* 661 F.3d 498, 516 (10th Cir. 2011) ("[U]se of a perjured affidavit to defeat a defendant's attempt to dismiss an indictment on grounds of selective prosecution could also conceivably represent a denial of due process."). Fabrication of evidence in order to pursue criminal charges offends fundamental notions of decency equally with false evidence used to obtain a conviction. "Fabricated evidence is an affront to due process of law, and state actors seeking to frame citizens undermine fundamental fairness and are responsible for 'corruption of the truth-seeking function of the trial process.'" *Black,* 835 F.3d at 370 (quoting *United States v. Agurs,* 427 U.S. 97, 104 (1976)).

The First Circuit has recognized a substantive due process claim based on fabricated evidence, declaiming "we are unsure what due process entails if not protection against deliberate framing under color of official sanction." *Limone v. Condon,* 372 F.3d 39, 44-45 (1st Cir. 2004). In order to sustain a due process fabrication of evidence claim, a plaintiff must "demonstrate that the fabricated evidence 'was so significant that it could have affected the outcome of the criminal case.'" *Black,* 835 F.3d at 372 (quoting *Halsey v. Pfeiffer,* 750 F.3d 273, 295 (3d Cir. 2014)). Certainly here the affidavit was critical to the issuance of a warrant justifying the searches. In addition, the plaintiffs must ultimately prove that the defendants knew the evidence was fabricated or false. *Id.; Cole v. Carson,* 802 F.3d 752, 774 (5th Cir. 2015), *vac. on other gnds, Hunter v. Cole,* ___ U.S. ___, 137 S.Ct. 497, 497 (2016) (allegation that police intentionally lied to cover up wrongful conduct by colleagues "directly led" to the decision to charge.).

21

In this case, it is undisputed that the Affidavits in support of the search warrants contained the implication – apparently false – that defendant Marcello had spoken personally to Source One. The fact of that falsity alone, however, does not necessarily meet the "shock the conscience" standard.[10] What *would* amount to conduct shocking the conscience of the Court is Ricci's theory that Source One never existed. Certainly, the fact that both officers denied speaking to Source One, and that they admit there is no documentation whatsoever of contact between Source One and anyone from the Department, raises a strong suspicion that the informant was entirely fabricated. However, the defendants deny this by affidavit, and thus put into dispute the very material fact of whether Marcello, with the knowledge and cooperation of Smith, and the awareness and cover-up of St. Sauveur, deliberately lied in order to obtain the warrants. Summary judgment cannot be granted and the parties' Motions for Summary Judgment on Count VI are DENIED.

### 3. Count III:  Intentional Infliction of Emotional Distress

Rhode Island recognizes a claim for intentional infliction of emotional distress.

'In order to impose liability on a defendant for intentional infliction of emotional distress: (1) the conduct must be intentional or in reckless disregard of the probability of causing emotional distress, (2) the conduct must be *extreme and outrageous*, (3) there must be a causal connection between the wrongful conduct and the emotional distress, and (4) the emotional distress in question must be severe.'

---

[10] It is certainly conceivable that if Marcello knew someone else had spoken to Source One, he might have inadvertently given the impression in the Affidavit that he had had the conversation himself. What Ricci alleges, however, is entirely different.

*Shannahan v. Moreau,* 202 A.3d 217, 230 (R.I. 2019) (quoting *Gross v. Pare,* 185 A.3d 1242, 1245-46 (R.I. 2018)) (emphasis original).  But state law is clear that to pursue that cause of action a plaintiff must suffer some physical manifestation of the emotional condition that defendant's actions have allegedly caused.  "Furthermore, 'this Court has required at least some proof of medically established physical symptomatology for both intentional and negligent infliction of mental distress.'" *Id.* at 230 (quoting *Gross*, 185 A.3d at 1246).

Ricci has alleged no physical symptomatology in his Third Amended Complaint.  "The existence of resulting physical symptomatology" must be pleaded. *Clift v. Narragansett Television L.P.,* 688 A.2d 805, 813 (R.I. 1996).  Ricci refers in his summary judgment memorandum to difficulty sleeping and to a loss of libido (ECF No. 62-1, internal pp 40-41[11].)  Exhibit 18 is a compendium of medical records circa 2021 that contain diagnoses of several things.  (ECF No. 62-1, at 170.)  One record notes that the loss of libido began in 2019 – two years after the search of the warehouse.  *Id.* at 176.  The doctor notes that he "suspects" it is due to stress.  *Id.* Even assuming these complaints are sufficient physical manifestations,[12] there is nothing offered in any of the records that would satisfy the element of causation.  In other words, there is no evidence submitted to support the conclusion that either the

---

[11] When an exhibit contains multiple documents, each has its own internal pagination and, in addition, has a page number indicating where it is in the ECF package.  Page numbers given herein refer to ECF pages unless "internal" pagination is noted.

[12] An October 20, 2020, answer to the assessment question "trouble falling or staying asleep, or sleeping too much" was "Not at all."  (ECF No. 62-1, at 187).

loss of libido or difficulty sleeping resulted from the stress or depression caused by the search.  "[W]e require for recovery, however, along with the vast majority of judicial authority, that psychic as well as physical injury claims must be supported by competent expert medical opinion regarding origin, existence, and causation." *Vallinoto v. DiSandro,* 688 A.2d 830, 839 (R.I. 1997).

In the absence of physical symptomatology pleaded and supported, the defendants are entitled to summary judgment on Count III.

### 4.  Direct Causes of Action under the Rhode Island Constitution

Two of the counts are brought as direct causes of action claiming violations of certain clauses of the Rhode Island Constitution.  This is in contrast to those counts claiming violations of the federal Constitution brought through the statutory vehicle of 42 U.S.C. § 1983.  Section 1983 creates a cause of action when state officials violate federally guaranteed rights.  There is no Rhode Island statute creating a cause of action for violations of either article 1, section 6 (unreasonable searches and seizures) or article 1, section 2 (due process) of the state Constitution.

Ricci asserts an implied cause of action stemming from the provisions of rights themselves, a course of action recognized by the United States Supreme Court in *Bivens v. Six Unknown Fed. Narcotics Agents*, 403 U.S. 388 (1971).  In *Bivens,* the Court reviewed a civil action brought to recover damages for a particularly egregious

violation of the Fourth Amendment by federal actors.[13]  With a six-judge majority,[14] the Court noted the absence of any existing statutory cause of action through which the victims of the unlawful search could recover for the violation of their Fourth Amendment rights and for the damages caused them.   In an envelope-pushing decision, the Court declared that the right of citizens to be compensated for federal constitutional violations should not be dependent on whether the state in which the violation occurred had provided a remedy.  *Id.* at 392.  Instead, the *Bivens* Court held that the federal Constitution itself created a right of action.   The *Bivens* opinion was expansive, speaking of constitutional rights generally.   Before the decade was out, the Court had recognized a direct cause of action in the Fifth Amendment's Due Process Clause.  *Davis v. Passman,* 442 U.S. 228, 243-44 (1979).  But since 1980, when *Carlson v. Green*, 446 U.S. 14, 19-20 (1980), decided that the availability of a remedy under the Federal Torts Claim Act for inadequate medical treatment in prison did not defeat a cause of action under *Bivens,* the recognition of implied rights of action has not been expanded.   *See* discussion in *Callahan v. Federal Bureau of*

---

[13] The handwritten *pro se* complaint alleged that six federal agents entered Bivens' home on the day after Thanksgiving, 1965, without probable cause or a warrant, searched and arrested him with unreasonable force, manacled him in front of his children, and threatened to arrest the entire family.  Pfander, James E., *The Story of Bivens v. Six Unknown -Named Agents of the Fed. Bureau of Investigation,* Northwestern    Univ.    Sch.    of    Law    Scholarly    Commons    (1979), https://scholarlycommons.law.northwestern.edu/cgi/viewcontent.cgi?article=1188&c ontext=facultyworkingpapers (accessed May 15, 2023).

[14] The *Bivens* opinion was authored by Justice William Brennan, who was joined by Justices Douglas, Marshall, Stewart and White.   Justice Harlan concurred in the judgment and Chief Justice Burger and Justices Blackmun and Black all dissented.

*Prisons,* 965 F.3d 520, 523 (6th Cir. 2020) (declining to recognize a direct cause of action for claims of First Amendment denials in prisons).  For nearly forty years after *Carlson,* the Court "consistently rebuffed requests to add to the claims allowed under *Bivens.*"  *Hernandez v. Mesa,* ___ U.S. ___, 140 S. Ct. 735, 743 (2020).  Most tellingly, a majority of the Court in *Mesa* went beyond merely expressing extreme reluctance to extend *Bivens* to opining that were the trio of *Bivens, Davis* and *Carlson* adjudicated in 2020, it is "doubtful" the same results would have been reached.  *Id.* at 742-43.

The Rhode Island Supreme Court has been no more friendly to implied causes of action under the Rhode Island Constitution than has its federal counterpart.[15]  In *Bandoni v. State,* 715 A.2d 580 (R.I. 1998), the Court reviewed a civil lawsuit brought for damages allegedly caused by a violation of article one section 23 of the Rhode Island Constitution, the State's then-newly enacted constitutional amendment guaranteeing victims of crime input into sentencings.  In order to provide a direct cause of action, the Court held, a constitutional provision must be "self-executing"; in other words, it must not be reliant on legislative action to create a cause of action to

---

[15] The general disinclination of the Rhode Island Supreme Court to recognize direct causes of action for constitutional violations is not recent.  As early as 1909, and relying on an 1865 case, the Court held that article 1, section 5 of the Rhode Island Constitution, which provides that "Every person within this state ought to find a certain remedy . . .  for all injuries or wrongs . . . ," did not create a private cause of action for invasion of privacy.  *Henry v. Cherry & Webb,* 73 A. 97, 107 (R.I 1909) (citing *Matter of Nichols,* 8 R.I. 50, 54 (1864)).

enforce it.[16]  A self-executing provision "suppl[ies] 'a sufficient rule by means of which the right given may be enjoyed and protected, or the duty imposed be enforced * * *.  A provision that is *not* self-executing "merely indicate[s] principles, without laying down rules by means of which those principles may be given the force of law[.]" *Id.* at 586 (quoting *Davis v. Burke,* 179 U.S. 399 403 (1900)).  Concluding the latter, the Court held there was no direct cause of action available to vindicate violations of article 1, section 23 and dismissed the claim of victims who had not been notified of their right to address the sentencing court.  *Id.* at 601.

### (a) Count V:  R.I. Const. Art. I § 6

Ricci seeks to establish, in Count V, a *Bivens* private cause of action under the state constitutional guarantee against unreasonable searches and seizures.  While he mounts a vigorous argument that the search lacked probable cause under R.I. Const. Art. 1 § 6, he does so as if this were a criminal case involving application of an exclusionary rule.  (*See* ECF No. 62-1, at 26-27, discussing *State v. Burgess,* 138 A.3d 195 (R.I. 2016)).  He does not address the need to establish a state equivalent of a *Bivens* claim in either his initial or reply memoranda in support of summary judgment.  (ECF No. 62-1, 78.)  Indeed, the plaintiff is entirely incorrect when he proclaims, "the right to be free from unreasonable search and seizure found in article 1, section 6 of the Rhode Island Constitution has long been recognized as self-executing and thus serves as a basis to bring a private right of action."  (ECF No. 73-

---

[16] Self-execution is a necessary, but not sufficient, condition to enable a suit for damages.  *Doe v. Brown Univ.,* 253 A.3d 389, 401 (R.I. 2021).

1, at 13.)  In support of that declaration, Ricci cites only *Bivens.*  It is true that the scope of the substantive search and seizure protection of article 1, section 6 is substantively coterminous with that of the Fourth Amendment, *State v. Werner,* 615 A.2d 1010, 1014 (1992),[17] but that is a far cry from overcoming the Rhode Island Supreme Court's clear disinclination to hold constitutional provisions to be self-executing.  In addition, it fails to take account of the disfavor in which *Bivens* seems to be held today by the Court which birthed it.  *See Mesa,* 140 S. Ct. at 742-43. Recently, another judge of this District noted a similar failure to identify

> authority in which the Rhode Island Supreme Court has sanctioned a direct cause of action under article 1, section 6 of Rhode Island Constitution analogous to that established in *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388 (1971). Instead, the Rhode Island Supreme Court has consistently refused to hold that constitutional provisions create a private cause of action without legislative action.

*Hagopian v. City of Newport,* C.A. No. 18-283 WES, 2021 WL 4742701, at *1, n.1 (D.R.I. Oct. 12, 2021).  This Court has been no more successful; the combination of the Rhode Island Supreme Court's continuous disinclination to recognize direct constitutional causes of action and the forewarning in *Mesa* that *Bivens* has lost its majority, lead to the same conclusion that Ricci may not maintain a cause of action for violation of article 1, section 6 of the Rhode Island Constitution.

---

[17] Until *Werner,* Rhode Island had differed from federal interpretation in at least two major situations.  One involved whether a lawful vehicle search without a warrant depended on exigency, *State v. Benoit,* 417 A.2d 895 (R.I. 1980), and the other dealt with random roadblocks, *Pimental v. Dept. of Transp.*, 561 A.2d 1348 (R.I. 1989).  *Werner* expressly overruled *Benoit* but did not mention *Pimental* which is presumably still good Rhode Island law.

**(b)** Count VII: Due Process Clause, R.I. Const. Art. 1 § 2

Two decades after *Bandoni*, in *Doe v. Brown Univ.,* 253 A.3d 389, 401 (R.I. 2021), the Rhode Island Supreme Court repeated its reluctance to "create a new cause of action" by judicial interpretation rather than legislative enactment. *Id.* Doe had sued Brown University for a violation of the equal protection provision of article 1, section 2 of the Rhode Island Constitution. Even if it found the provision self-executing, the Rhode Island Supreme Court held, it would decline to "adjust[] remedies to rights," which is "a legislative responsibility rather than a judicial task." *Id.*

The due process provision of the Rhode Island Constitution is contained in the same article 1, section 2 as the equal protection provision addressed in *Doe*:

> All free governments are instituted for the protection, safety, and happiness of the people. All laws, therefore, should be made for the good of the whole; and the burdens of the state ought to be fairly distributed among its citizens. No person shall be deprived of life, liberty or property without due process of law, nor shall any person be denied equal protection of the laws. No otherwise qualified person shall, solely by reason of race, gender or handicap be subject to discrimination by the state, its agents or any person or entity doing business with the state. Nothing in this section shall be construed to grant or secure any right relating to abortion or the funding thereof.

Like the equal protection clause addressed in *Doe*, the due process clause is part of an Article that expresses general principles. The due process provision has the same "broad scope and utter lack of any means by which these rights may be enjoyed, protected, or enforced." *Bandoni,* 715 A.2d at 588. Like article 1, section 23, it provides no "procedural means by which [citizens] may enjoy or protect their rights

…" *Id.* The due process clause and equal protection clause are twin branches of the same tree and there is no reason to believe the Rhode Island Supreme Court would recognize a direct cause of action under the former after having rejected the same claim under the latter.

### (c) Summary

At the time it was decided, *Bivens* operated in a landscape in which there was no remedy other than a direct cause of action under the Fourth Amendment available to a plaintiff. Even though *Carlson* held that the existence of an alternate remedy – in that case under the Federal Tort Claims Act – would not defeat a *Bivens* claim, it is significant that in this case the plaintiffs may bring a lawsuit for violation of federal rights pursuant to 42 U.S.C. § 1983 since the offending conduct was carried out by state and local officials. Indeed, the other counts in this Complaint attest to the availability of other remedies. That is another reason why this Court declines to presume that a private cause of action exists under either article 1, section 2 or 6 of the Rhode Island Constitution. The defendants' Motions for Summary Judgment on Counts V and VII are GRANTED.

### 5. Count X: RICRA

Ricci contends that the Town of Smithfield and its officers acted in violation of the Rhode Island Civil Rights Act ("RICRA"), R.I.G.L. § 42-112-1 *et seq,* by targeting him because of his medical marijuana patient status and "attempting to curtail [his] medical marijuana patient rights." (ECF No. 51, ¶¶ 131, 132). He maintains that

his medical marijuana card presumes a disability.  He points to the alleged lies and fabrication in the warrant affidavit as proving the intent to discriminate against him as a medical marijuana patient, and to what he terms the "deceptive[]" information that Ricci lacked a cultivation license when by law he was not required to have one.[18] The plaintiff characterizes that deception as an attempt to raise an inference that Mr. Ricci should have had these licenses, and to confuse the magistrate of what was actually required under the Slater-Hawkins Act.  Beyond the individual officers, Ricci contends contend that the Town of Smithfield itself "has a history of attempting to curtail medical marijuana patient rights."  *Id.* at ¶ 131.

The essence of the plaintiff's claim is that he was subject to special prosecution efforts, and greater punishment, because of his disability as a medical marijuana patient.[19]  The problem, however, is that RICRA has not been applied by the Rhode Island Courts to reach disability discrimination outside a contractual relationship, almost always in the employment context.   "[RICRA was] enacted to provide

---

[18] The warrant Affidavit recited that the property was not a registered cultivation center without indicating that it did not need to be to grow medical marijuana on the property.  (ECF No. 62-1, at 53-54.)

[19] RICRA expressly adopts the definition of "disability" contained in R.I.G.L. § 42-87-1(i): "a physical or mental impairment that substantially limits one or more of the major life activities of such individual."  That is the same definition that constitutes a "debilitating medical condition," which is what entitles a person to a medical marijuana card:  R.I.G.L. § 21-28.6-3(10).  After extensive analysis, in what appears to be the only Rhode Island judicial opinion addressing this issue, Associate Justice Richard Licht of the Rhode Island Superior Court concluded that a person who holds a medical marijuana card in Rhode Island is "disabled" under the terms of RICRA.  *Callaghan v. Darlington Fabrics Corp.,* C.A. No. PC-2014-5680, 2017 WL 2321181, at *11 (May 23, 2017).  This Court need not reach that issue.

protection against discrimination in employment . . . RICRA expressly deal[s] with the subject of employment discrimination . . .." *Horn v. S. Union Co.,* 927 A.2d 292, 294-95 (R.I. 2007).  "The Rhode Island Civil Rights Act provides broad protection against all forms of discrimination in all phases of employment." *Ward v. City of Pawtucket,* 639 A.2d 1379, 1381 (R.I. 1994).  There is "precious little case law addressing the scope of RICRA in any respect," *Liu v. Struili,* 36 F. Supp. 2d 452, 469 (D.R.I. 1999), but the two cases in which RICRA has been invoked in this Court outside of an employment context have both been situations of contractual relationships.  *Liu,* 36 F. Supp. 2d at 479 (alleged sexual harassment of student by college professor, citing the contractual nature of "a student's relationship with an institution of higher education."); *Doe v. Brown Univ.,* 327 F. Supp. 3d 397, 414 (D.R.I. 2018) (student sued university for disability discrimination).[20]  There is no contractual relationship between the parties here, and the Court declines to assume a scope of RICRA which has not been endorsed by the Rhode Island Supreme Court. The Motion for Summary Judgment on Count X filed by the Smithfield defendants is GRANTED and the plaintiffs' Motion is DENIED.

---

[20] The First Circuit has commented that RICRA applies "both inside and outside the employment context," *Rathbun v. Autozone, Inc.,* 361 F.3d 62, 69, n.2 (1st Cir. 2004), but it has not made the same observation about whether it applies outside the contractual context.

### D. *HECK V. HUMPHREY* PRECLUSION

The defendants maintain that the plaintiffs' claims[21] constitute a collateral attack on an outstanding criminal conviction and are, therefore, precluded by *Heck v. Humphrey*, 512 U.S. 477, 487 (1994). *Heck*

> bars civil litigation that impugns the integrity of a criminal conviction *unless* the conviction has already been questioned. It can be called into question by being "reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus." *Figueroa v. Rivera,* 147 F.3d 77, 80 (1st Cir. 1998).

*Tempest v. Remblad,* No. 1:20-cv-00523-MSM-LDA, 2022 WL 2817865, *7 (D.R.I. July 19, 2022). Only an outstanding conviction bars a civil action that impugns its integrity. *Thompson v. Clark,* ___ U.S. ___, 142 S. Ct. 1332, 1335 (2022).

*Thompson's* discussion is in the language of civil actions for malicious prosecution, which *Heck* had found was the most analogous tort to a Fourth Amendment claim. *Id.* at 1337 ("The narrow dispute in this case concerns one element of the Fourth Amendment claim under § 1983 for malicious prosecution."). *Heck* itself*,* however, was aimed at a broader field: "§ 1983 damages claims that do call into question the lawfulness of conviction or confinement …" *Heck,* 512 U.S. at 483. *Thompson* clarifies the holding of *Heck* with respect to what status of a criminal case being challenged in the civil action will bar the action for damages.

---

[21] The defendants fail to distinguish between Ricci and Custom Construction. The Court finds *Heck* preclusion inapplicable to the business, which is a plaintiff only in Count II. The business was not criminally prosecuted. Therefore, there is no conviction or other adjudication in state court against the business that would preclude a civil claim in federal court.

*Heck* is not an obstacle in this case. First, there appears never to have been a conviction. The plaintiffs' memorandum reveals a misunderstanding about Rhode Island criminal law. It asserts that upon his *nolo* plea, Ricci "received a one year filing for this misdemeanor charge." (ECF No. 72, at 16.) Yet later claims he was placed on a year's probation, presumably pursuant to R.I.G.L. § 12-18-1. *Id.* The two are not the same. A filing is a legislatively created disposition by which both adjudication and sentencing on a misdemeanor complaint are delayed for a statutory period of one year. At the conclusion of the year during which the defendant has been of good behavior the charge is essentially dismissed by operation of law. R.I.G.L. § 12-10-12(c). The probation statute provides that the disposition may not be used as a "conviction" for any purpose. R.I.G.L. § 12-18-3. The filing statute goes further: the passage of a successful year means that "[n]o criminal record shall result." R.I.G.L. § 12-10-12(c). Thus, it is tantamount to a dismissal, not merely to a conviction for limited purposes only.

Smithfield's Exhibit G is a transcript of the Superior Court proceeding. It is clear that, rather than place the plaintiff on probation, the Court "filed" the amended charge. (ECF No. 57, Exh. G.) ("In the matter of P2-2018-1628A, the remaining amended count on this matter will be filed for one year."). The disposition never was a conviction in the first place.[22]

---

[22] Even if Ricci had been placed on probation, any conviction resulting for any purpose has been expunged. *Heck* itself recognized that an expungement "called into question" a conviction. While *Heck* refers to an "expunge[ment] by executive order," the Court sees no significant difference between an expungement granted in the executive's discretion or one granted by operation of law.

The purpose of *Heck* was twofold:  first, to avoid the use of civil actions to substitute for writs of habeas corpus to challenge convictions; and second, to avoid the prospect of inconsistency between a conviction and a subsequent successful constitutional challenge to that conviction's underpinning in a civil action.  Neither is a concern here.  One could not have brought a habeas corpus petition to "undo" a filing since it is not a judgment of the court much less a final one.  Nor could such a petition be brought to vacate an expunged conviction.  *Cf., Klen v. City of Loveland,* 661 F.3d 498, 516 (10th Cir. 2011) (where the sanction imposed against the defendant lacked sufficient indicia of custody to permit him to challenge it in a *habeas* proceeding, *Heck* was no bar to the civil action).  Second, neither a successful filing nor an expunged conviction has any continuing legal effect, so no inconsistency could arise were the civil action in this Court successful.  Expungement has the same legal effect as a pardon, which "fulfills the purposes of Heck's invalidation requirement." *Carr v. Louisville-Jefferson Cnty.,* 37 F.4th 389, 394 (6th Cir. 2022).  "A full pardon removes all legal consequences of the individual's conviction, avoiding the concern of parallel litigation with an outstanding criminal proceeding." *Id.*  "*Heck* does not present the same bar to § 1983 suits where the underlying conviction has already been expunged; the conviction is no longer 'outstanding.'" *Poventud v. City of New York,* 750 F.3d 121, 134 (2d Cir. 2014).

Whether a resolution such as a filing is a bar under *Heck* has been the object of some attention and differing views in federal courts.  In the District of

Massachusetts, a case that has been "continued without a finding"[23] has been held to be a *Heck* bar, even though once the pretrial probation period passes, the charge is dismissed. *Cabot v. Lewis,* 241 F. Supp. 3d 239, 250-51 (D. Mass. 2017). Other courts have reached opposite conclusions. *See Tomashek v. Raleigh Cnty. Emergency Operating Ctr.,* 344 F. Supp. 3d 869, 874 (S.D.W. Va. 2018) (collecting cases). In *Tomashek*, the Court declined to impose a *Heck* bar because of the defendant's entry into a pretrial diversion program. 344 F. Supp. 3d at 874. It reasoned that pretrial diversion results in neither an adjudication of guilt nor a conviction; successful completion results in a dismissal. *Id.* at 874-75. The very purpose of the program is to "avoid[] a judgment of criminal guilt – the opposite of a conviction in a criminal action." *Id.* at 875.

This Court declines to hold this action precluded by *Heck* for two reasons. First, although a decision by a sister District, as *Cabot* is, would normally be entitled to great consideration, *Cabot* pre-dated *Clark v. Thompson,* which dramatically softened *Heck's* preclusion effect. Until *Clark, Heck's* literal language had required a state court disposition that was "favorable" to the defendant, which the First Circuit had interpreted as tantamount to an acquittal or other exoneration. In *Clark,* the Supreme Court set a much lower bar – that the state court criminal charge not have

---

[23] "Continued without a finding" is similar to filing; the case is continued for a specific period; if the defendant complies with whatever conditions are placed upon it, the case is dismissed on that date. M.G.A. 278, § 18.

ended in a "conviction."[24]  *Cabot* itself acknowledged that its narrow view of *Heck* "ignores, and appears to be inconsistent with, the purposes and rationale of *Heck*." *Cabot,* 241 F. Supp. 3d at 252.  Thus, there is reason to believe the *Cabot* Court would reach a contrary result, consistent with this Court, were it to consider the issue post-*Clark.*

In this Court's view, while pre-*Clark* one might not have been able to say that a filing was tantamount to an acquittal or exoneration, it certainly is not a conviction which is, post-*Clark,* now a precondition to *Heck* preclusion.  *See McClish v. Nugent,* 483 F.3d 1231, 1251 (11th Cir. 2007) *(Heck* "inapposite" where defendant's participation in pretrial intervention program resulting in ultimate dismissal: "The issue is not … whether [Appellant's] participation in [pretrial intervention program] amounted to a favorable termination on the merits.  Instead, the question is an antecedent one – whether *Heck* applies at all since [Appellant] was never convicted of *any* crime.").

Second, it seems fundamentally unfair to interpose a *Heck* preclusion on Ricci's claims that law enforcement intentionally fabricated a confidential informant to secure a warrant because Ricci accepted the lowest possible disposition in Rhode Island criminal law to resolve the criminal case.  At that time, he did not know of the evidence from which an inference of fabrication could be drawn and, indeed, under

---

[24] In *McAllister v. Johnson,* No. 1:19CV13, 2022 WL 3359126, *10 n.10 (M.D.N.C. Aug. 15, 2022), the Court noted the change wrought by *Clark* in rejecting a *Heck* preclusion where the defendant challenged his assault arrest after the assault charge was dismissed in consideration for the defendant's plea to a manslaughter charge.

the Rules of Criminal Procedure in Rhode Island, no discovery deposition of right is allowed.  It is somewhat facetious for the defendants to claim that "it [was] incumbent upon Plaintiff to challenge the evidence through a *Franks [v. Delaware]]* hearing." Ricci had no factual basis at all for requesting a *Franks* hearing which is gained only after surmounting a high threshold of proffered evidence of falsity.

The Court therefore declines to impose *Heck v. Humphrey* as a bar to this action.

### E.  *YOUNGER V. HARRIS* ABSTENTION

The Court has granted Summary Judgment to the State and to Smithfield.  It has also granted Summary Judgment to the individual defendants on Counts III, V, VII, and X.  The "live" Counts, against the individual defendants only, are Counts I (Trespass), II (Conversion), IV (Fourth Amendment), VI (Due Process), and XII (False Imprisonment).   While these latter claims have been supported with sufficient evidence to go forward, that does not necessarily mean that they should.   The defendants contend that the pendency of a forfeiture action brought against a huge list of real property and personal items owned by Ricci and Custom Construction requires this Court to abstain.  *See* R.I. Super. Ct. docket P2-2017-5620.

*Younger v. Harris,* 401 U.S. 37 (1971), counsels that as a matter of comity, federal courts should sometimes refrain from acting while state court proceedings are pending.  Although a forfeiture action is not a direct prosecution, *Younger* extends "to 'particular state civil proceedings that are akin to criminal prosecutions,' *see Huffman v. Pursue, Ltd.,* 420 U.S. 592, 595 S. Ct. 1200, 43 L. Ed.2d 482 (1975), or

that implicate a State's interest in enforcing the orders and judgments of its courts, *see Pennzoil Co. v. Texaco Inc.,* 481 U.S. 1, 107 S. Ct. 1519, 95 L. Ed.2d 1 (1987)." *Sprint Commc'ns, Inc. v. Jacobs,* 571 U.S. 69, 72 (2013). "The policies underlying *Younger* are fully applicable to noncriminal judicial proceedings when important state interests are involved." *Middlesex Cnty. Ethics Comm. v. Garden State Bar Ass'n,* 457 U.S. 423, 432 (1982).

*Younger* abstention may be warranted when three criteria are met: "there are state proceedings that are (1) currently pending; (2) involve an important state interest; and (3) will provide the federal plaintiff with an adequate opportunity to raise his or her constitutional claims." *Habich v. City of Dearborn,* 331 F.3d 524, 530 (6th Cir. 2003). The opportunity in state court to litigate the constitutional claims includes the availability of relief comparable to what would be afforded in federal court. *Bridges v. Kelly,* 84 F.3d 470, 477 (D.C. Cir. 1996) (only relief in District proceedings were reinstatement and back pay, whereas federal civil suit afforded the opportunity for compensatory and punitive damages.). The countervailing consideration to an exercise of comity, however, is that "federal courts ordinarily should entertain and resolve on the merits an action within the scope of a jurisdictional grant, and should not 'refus[e] to decide a case in deference to the States.'" *Sprint Commc'ns, Inc.,* 571 U.S. at 73 (quoting *New Orleans Pub. Serv., Inc. v. Council of the City of New Orleans,* 491 U.S. 350, 368 (1989)).

The plaintiffs contend that the government defendants should be unable to invoke *Younger*, or presumably any doctrine grounded in federal comity, because

their removal action was responsible for moving the case from state court where it was filed to federal court where it is lodged now. There is some support for this proposition. "Permitting a defendant to remove cases from state court then immediately invoke the *Younger* abstention doctrine to obtain dismissal would leave plaintiffs without any forum to pursue federal claims." *Hill v. Town of Valley Brook,* 595 F. Supp. 3d 1030, 1038 (W.D. Okla. 2022). *Accord, Guy v. Lorenzen,* 547 F. Supp. 3d 927, 952 (S.D. Cal. 2021). The defendants reply that even without removal they could interpose an abstention concept to persuade a Superior Court judge to defer a civil action for damages pending completion of the forfeiture procedure. That may be so, but there would be no consideration of federal comity. While the analogy to a waiver of immunity is not perfect, there is some similarity in the idea that after defendants choose a federal forum, they should be unable to invoke a doctrine that expressly claims that the federal forum is inappropriate.

A forfeiture action was filed against property owned by both Ricci and Custom Construction. The plaintiffs have, in substance, raised in the forfeiture action the same constitutional claims raised here. They claim an unlawful search, a violation of due process rights, and the levy of an excessive fine. The relief they are able to seek in the forfeiture action, however, is markedly narrower than that available in the civil action. They seek dismissal of the forfeiture action, return of property, and attorneys' fees and costs related to the forfeiture action. Nowhere is there a claim for compensatory or punitive damages, and it appears that those remedies are not available in the forfeiture proceeding. *See Bridges,* 84 F.3d at 477. The statutory

scheme around civil forfeiture in Rhode Island makes provision only for return of the property.  R.I.G.L. § 21-28-5.04.2(o).  No costs or damages are available if there was "reasonable cause for the seizure or the filing of the complaint."  *Id.*

In addition, it seems evident from the language of the statute that the only constitutional defense to forfeiture is the absence of probable cause.  R.I.G.L. 21-28-5.04.2(p) ("In any action brought under this section, the state shall have the initial burden of showing the existence of probable cause for seizure or arrest of the property.").  Once the State shows probable cause, "the claimant shall have the burden of showing by a preponderance of evidence that the property was not subject to forfeiture under this section."  *Id.*  Being "not subject to forfeiture" simply means not being used in connection with enumerated drug offenses in Title 21, Chapter 28.  R.I.G.L. 21-28-r.04(a).

Thus, it appears from the statutory language that *no* defense, other than the absence of probable cause or that the *res* is not connected to drugs is available.  The State meets its burden of showing probable cause simply by proffering the warrants; if probable cause were the product of fabrications in the affidavit in support of the search warrant, that may well be outside the scope of defenses available in the forfeiture action.  So it would seem might be the plaintiffs' "shock the conscience" claim.  Neither the plaintiffs nor the defendants have produced any case law on either side of this issue, nor has the Court found any.  It is incumbent upon the defendants, however, to establish the *Younger* criterion that the state proceeding affords the plaintiff the same opportunity to litigate the claims he raises in his federal

Complaint.  All the defendants proffer is that the plaintiffs have articulated those challenges to the state court:  there is no indication they will be entertained.

There are many reasons why the Court declines to abstain, at least at this time.[25]  While the state's interest in forfeiture of the plaintiffs' property is significant, it pales in comparison to the importance of resolving the plaintiffs' claim that members of the Smithfield Police Department actively lied to a judicial officer – twice – in order to obtain search warrants.  Second, it appears uncertain that the plaintiffs' due process claim is even within the scope of the forfeiture hearing.  Third, the forfeiture proceeding surely cannot provide the plaintiffs with the remedies to which they would be entitled in this Court were they ultimately successful.  And fourth, the forfeiture complaint was filed on November 22, 2017, five-and-one-half years ago and has not yet been heard.[26]  There is no presumption in favor of abstention simply because related state proceedings are pending.  Indeed, abstention is the *exception* to the presumption that a federal court should proceed to adjudicate disputes over which it has jurisdiction.  *New Orleans Pub. Service, Inc. v. Council of City of New Orleans,*

---

[25] Even when the criteria for *Younger* abstention are met, a stay rather than dismissal may be appropriate.  *Gilbertson v. Albright,* 381 F.3d 965, 968 (9th Cir. 2004) (federal actions for damages should be stayed until state proceedings are completed rather than dismissed).  In *Gilbertson,* the federal action was ultimately dismissed after state proceedings had concluded.  *Gilbertson v. Albright,* No. Civ. 01-6292-HO, 2005 WL 2044006 (D. Ore. Aug. 23, 2005).

[26] The Court takes judicial notice of docket Rhode Island Superior Court docket PC-2017-5620, *State of Rhode Island v. One 2014 Mercedes-Benz Sprinter 250, et al.*  The forfeiture proceeding is currently scheduled for August 16, 2023.  If that proceeding is held and significantly changes the complexion of the case before this Court, either party may bring that to the Court's attention.

491 U.S. 350, 368 (1989) (reciting the "rule that only exceptional circumstances justify a federal court's refusal to decide a case in deference to the States.").

The request by the Smithfield defendants that the Court abstain in this case is DENIED.

## VI.    CONCLUSION

A.    The State of Rhode Island is GRANTED summary judgment on all Counts in which it is named.

B.    The Town of Smithfield's Motion for Summary Judgment is GRANTED with respect to Counts III, IV, V, VI, VII, VIII, IX, X and XI.

C.    The Motions for Summary Judgment of the Smithfield defendants, on Counts III, V, VII, and X are GRANTED.  The individual defendants' Motions are DENIED with respect to Counts I, II, IV, VI, and XII.

D.    The Plaintiffs' Motion for Summary Judgment is DENIED.

IT IS SO ORDERED:

_____
Mary S. McElroy,
United States District Judge

Date:    July    21, 2023

43